UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:16-CV-00180-GNS-HBB

CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON              PLAINTIFF

v.

EUGENE C. MORROW et al.             DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions for Summary Judgment (DN 122, 123, 124), Plaintiff's Motion for Summary Judgment (DN 125), Defendant's Motion to Exclude Expert Testimony (DN 121), Plaintiff's Motion to Exceed Page Limit (DN 140), Defendants' Motions to Exceed Page Limit (DN 139, 147); and Plaintiff's Motion to File Supplemental Materials (DN 149). The motions are ripe for adjudication. For the reasons set forth below, the motions to exceed page limit are **GRANTED**, the motion for leave to file supplemental materials is **GRANTED**, and all other motions are **DENIED**.

### I.  BACKGROUND

The events giving rise to this action occurred October 12 and 13, 2015. (Compl. ¶ 1, DN 1). Defendant Klaus Bermel-Schanz ("Bermel-Schanz") left his home in Georgia and eventually stopped at the Flying J Truck Stop some six hours away in Simpson County, Kentucky, to rest and refuel. (Compl. ¶ 21). While maneuvering to refuel, Bermel-Schanz's truck struck and killed

Margaret E. Morrow.[1]  (Compl. ¶ 21).  The accident is the subject of a tort suit also filed in this Court.  *Morrow v. Horizon Transport, Inc. et al.*, No. 1:16-CV-158-GNS.

It is undisputed that, at the time of the accident, Bermel-Schanz was driving a 2014 Dodge Ram ("the vehicle") which he owned but leased to Horizon Transport ("Horizon").  (Compl. ¶ 6; Scottsdale's Mem. Supp. Mot. Summ. J. 3, DN 122-1 [hereinafter Scottsdale's Mot.]).  Plaintiff Certain Underwriters at Lloyd's London ("Plaintiff" or "Certain Underwriters") filed this declaratory action seeking a declaration that it is not liable to indemnify or cover Bermel-Schanz under its non-trucking liability policy ("NTL Policy").  (Compl. ¶¶ 1-2).  Certain Underwriters has moved for summary judgment on this issue.  (Certain Underwriters' Mot. Summ. J. DN 125 [hereinafter Certain Underwriters' Mot.]).   Defendant Scottsdale Insurance Company ("Scottsdale") likewise seeks summary judgment declaring that Certain Underwriters is liable to defend Bermel-Schanz and cover any damages.  (Scottsdale's Mot. 22).

Horizon was covered by a Scottsdale insurance policy ("Trucking Policy"), which provided coverage for activities related to the commercial use of the vehicle.  The relevant policy language from Certain Underwriters' NTL Policy states as follows:

> We will pay all sums you legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, resulting from an "accident" involving the personal use of a "covered commercial vehicle(s)" or "trailer(s)" owned, maintained or used as a "covered commercial vehicle(s)".

(Compl. Ex. 3, at 7, DN 1-3).

Further, that policy defines "personal use" as follows:

> "Personal Use" means the private use of the "covered commercial vehicle(s)."
> "Personal Use", however, does not include the following:
> a.    Any use of the "covered commercial vehicle(s)" while in the business of or furthering the business of any motor carrier.

---

[1] Eugene C. Morrow is the personal representative of the Estate of Margaret Morrow, and the Court will refer to the estate collectively as "Morrow."

> b. Any "covered commercial vehicle(s)" when being used for or when under orders from or after being dispatched by any motor carrier or lessee of such "covered commercial vehicle(s)" until you have finished the assignment including return to your initial point of dispatch or your principal place of garaging, whichever comes first.
>
> c. Any "covered commercial vehicle(s)" when being used for or in furtherance of any maintenance schedule(s), requirements, policies or needs of the motor carrier or lessee.

(Compl. Ex. 3, at 8).

Finally, Certain Underwriters' NTL Policy contains exclusions as follows:

> This insurance does not apply to:
> 1. A "covered commercial vehicle" or "trailer(s)" while used to carry property in any business.
> 2. A "covered commercial vehicle" or "trailer(s)" while being used in the business of or furthering the business of a motor carrier designated in the certificate.
> 3. A "covered commercial vehicle(s)" or "trailer(s)" when being used in the business of anyone to whom the "covered commercial vehicle" is leased, if the lease requires the motor carrier to carry primary insurance for liability arising out of your use of the "covered commercial vehicle" or "trailer(s)". However, the above exclusions (D1 and D2) apply only if there is another liability insurance which is valid and collectible, applicable to the "covered commercial vehicle", which provides the minimum kinds of insurance required by law and which meets the minimum limits specified by the compulsory or financial responsibility laws of the jurisdiction where the "covered commercial vehicle(s)" or "trailer(s)" is being registered or principally garaged or the minimum limits specified by any law governing motor carriers of passengers or property, whichever is applicable.
> 4. A "covered commercial vehicle(s)" or "trailer(s)" when being maintained or used under any permit, authority or operating rights granted by any governmental agency to operate as a Common or Contract carrier including your own permit, authority or rights.

(Compl. Ex. 3, at 9).

Certain Underwriters and Scottsdale agree at least on the dispositive question with respect to coverage. Certain Underwriters' NTL Policy covered only Bermel-Schanz's personal use of the vehicle. Bermel-Schanz's lease agreement with Horizon permitted him to use the vehicle for

3

his personal use when he was not hauling loads for Horizon. The issue, then, is whether Bermel-Schanz was "in the business of or furthering the business of" Horizon at the time he struck and killed Margaret Morrow in the parking lot of the Flying J Truck Stop. If he was so engaged, Scottdale's Trucking Policy would provide coverage; if not, Certain Underwriters' NTL Policy would apply.

## II. JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

## III. DISCUSSION

### A. Motions for Summary Judgment (DN 122, 123, 124)

The parties have filed competing motions as to the coverage issues raised in this case. In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

    1.    *Choice of Law*

The Court must first determine which state's law governs interpretation of Certain Underwriters' NTL Policy.[2] In diversity actions, "federal courts apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 417 (1996). "When a conflict of law arises during such an action, 'the choice-of-law rules of the forum state' govern." *Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014) (quoting *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000)). In other words, a federal court sitting in diversity resolves conflicts of law by applying the choice-of-law rules of the state in which the court sits. *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)). As a result, this Court is bound by Kentucky's choice-of-law rules.

Kentucky law applies different tests to choice-of-law issues depending on whether the underlying action sounds in tort or contract. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). Where, as here, the dispute is contractual in nature, Kentucky courts apply the "most significant relationship test" articulated in Section 188 of the Restatement (Second) of Conflict of Laws (1971). *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 566-67 (Ky. 2012).

---

[2] The choice-of-law provision in the Scottsdale Trucking Policy is not relevant to resolving the issues raised in the pending motions.

The factors to consider when determining the law applicable to a contractual dispute include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation, and place of business of the parties." *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 710 (W.D. Ky. 2013) (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)). These factors are to be considered alongside the principles enumerated in Section 6 of the Restatement: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* "When using this framework, the Court 'must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision.'" *Id.* (quoting *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996)).

Despite Kentucky's general tendency to be "very egocentric or protective concerning choice of law questions[,]" in this instance, the factors clearly favor an application of Georgia law to the interpretation of Certain Underwriters' NTL Policy. *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. App. 1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994). Bermel-Schanz, the insured, is a resident of Georgia who entered into the insurance contract in Georgia. The accident giving rise to this dispute occurred in Kentucky, but that accident is the subject of the underlying tort suit and does not affect the interpretation of

Certain Underwriters' NTL Policy's coverage. While the vehicle that is the subject of the insurance policy is mobile, it is garaged in Georgia.

Moreover, considerations of certainty and uniformity of result strongly favor applying Georgia law. Truck drivers are by their nature mobile. A choice-of-law rule that would apply the law of the forum where the accident occurred rather than the forum where the contract was entered into would result in an unnecessarily complicated hodgepodge of considerations for both the insurer and the insured. As no one could predict where a potential accident might occur, the parties to an insurance agreement would be forced to somehow plan for all possible legal contingencies before entering into a contract. In the interest of certainty and uniformity to claims arising from an insurance policy procured in Georgia by a Georgia resident covering a truck garaged in Georgia, the Court will apply Georgia Law.

### 2. *Furthering the Business of Horizon*

As stated above, the issue for determination in this declaratory action is whether Bermel-Schanz was acting in the business of or furthering the business of Horizon at the time of the accident. Under Georgia law, the determinative fact in this particular case is whether Bermel-Schanz was en route to Horizon's facility for the purpose of picking up a load. *Hot Shot Express, Inc. v. Assicurazioni Generali, S.P.A.*, 556 S.E.2d 475, 478 (Ga. Ct. App. 2001). If the undisputed facts show that Bermel-Schanz's activity was not part of his "regular work pattern" or "operational routine," then Scottsdale is entitled to summary judgment, and Certain Underwriters' NTL must provide coverage. *Id.* (internal quotation marks omitted) (citation omitted). Alternatively, if the undisputed facts show that Bermel-Schanz's activity was part of his regular work pattern or operational routine, then Certain Underwriters is entitled to summary judgment.

The problem for both Scottsdale and Certain Underwriters' motions is that the facts are disputed. Bermel-Schanz's regular routine was to drive his truck from his home in Georgia to Horizon's headquarters in Indiana to pick up loads. The Flying J Truck Stop where the accident occurred is roughly halfway between Bermel-Schanz's home and Horizon's facility, and tax receipts from Bermel-Schanz Trucking Expense Binder indicate he had stopped at this truck stop on numerous previous occasions to refuel on those trips. (Certain Underwriters' Mot. Summ. J. Exs. 15A-15D, DN 125-15 to 125-18). Additionally, after the accident, Bermel-Schanz first called Horizon who suggested he head home, submit to a drug test, and take a few days off the road. (Bermel-Schanz Dep. 161:7-19, 206:8-15, 168:5-15, May 10, 2017, DN 125-2). On the other hand, Bermel-Schanz testified that he was only taking a drive to clear his head, and he stopped at the Flying J to mull over business opportunities. (Bermel-Schanz Dep. 136:1-21). Bermel-Schanz also testified he was considering meeting a friend at the truck stop on unrelated business, and at the time he had not made his mind whether he would continue to Indiana to pick up a load. (Bermel-Schanz Dep. 138:3-9, 139:5-11).

Scottsdale encourages the Court to credit Bermel-Schanz's testimony to the exclusion of the circumstances surrounding the accident, arguing Bermel-Schanz's testimony must be accepted as the only evidence of his intent when he drove from his home to the Flying J Truck Stop. (Scottsdale's Mot. 17). Certain Underwriters, on the other hand, seeks to overlook problematic portions of Bermel-Schanz's testimony and to draw inferences only from the appearance created by the objective facts surrounding the accident. (Certain Underwriters' Mot. 11). Taking either position, however, would amount to an improper finding of fact by the Court. A reasonable juror might choose to credit Bermel-Schanz's deposition testimony, or could choose to accept Certain Underwriters' framing of the events surrounding the accident.

Other facts cited by both sides flesh out certain details of the events related to the accident, but the weight given those facts is ultimately a jury issue. For instance, Scottsdale argues the fact that Bermel-Schanz had not hauled a load in four days counsels against a finding that he was furthering Horizon's business on this particular trip. The fact that Bermel-Schanz had not hauled a load for Horizon in four days is undisputed. (Certain Underwriters' Resp. Scottsdale's Mot. Summ. J. 3, DN 131). The issue, however, is how much, if any, weight should be afforded this undisputed fact. After all, the question isn't whether Bermel-Schanz was furthering Horizon's business during those four days. The question is whether Bermel-Schanz was furthering Horizon's business at the time of the accident.

Additionally, no evidence indicates that Bermel-Schanz was directly under dispatch from Horizon. Under Georgia law, however, it is not necessary for a driver to be under dispatch at the time of an accident to be furthering the business of the trucking company. *Hot Shot Express*, 556 S.E.2d at 478. The jury will be able to weigh the significance of this fact along with the other considerations already discussed and to reach a determination.

Certain Underwriters contends that *Hot Shot* should control the outcome. (Certain Underwriters' Mot. 27-28). The Court might agree if, as in *Hot Shot*, the facts were not in dispute, but such is not the case. Certain Underwriters has presented sufficient facts to cast doubt on the credibility of Bermel-Schanz's testimony, and it is within the province of the jury to make credibility determinations. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Therefore, both Scottsdale and Certain Underwriters' summary judgment motions will be denied.

### 3. *The Statutory Employee Doctrine*

Morrow and Horizon have also filed dueling summary judgment motions. Morrow asks the Court for a declaration that Bermel-Schanz was a statutory employee of Horizon under the Federal Motor Carrier Safety Regulations ("FMCSRs"). Horizon asks the Court for a declaration that Bermel-Schanz was not.

The FMCSRs are promulgated by the Interstate Commerce Commission ("ICC").[3] The ICC regulation at issue here states that, where a carrier such as Horizon leases its vehicles:

> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1).

Courts interpreting this regulation have held it creates an irrebuttable presumption that the carrier was the statutory employer of the individual driving the leased vehicle. *Bays,* 691 F. Supp. 2d at 730 (collecting cases). The effect of statutory employment was to impose strict liability on the carriers for accidents caused by individuals driving leased vehicles. *Id.* A subsequent 1992 amendment to ICC regulations clarified Section 376.12 by noting that "[n]othing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 C.F.R. § 376.12(c)(4); *see Bays*, 691 F. Supp. 2d at 729-31 (discussing the history of the ICC regulations)

---

[3] "The ICC was abolished in 1995, and today, the Federal Motor Carrier Safety Administration (FMCSA), formerly a part of the Federal Highway Administration, within the United States Department of Transportation, maintains the regulations and promulgates new ones." *Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 728 n.1 (W.D. Ky. 2010) (citation omitted). Because case law generally still refers to ICC regulations, the Court will also use this term.

In interpreting the amendment, the ICC issued commentary clarifying that the ICC did not wish to create an automatic and irrebuttable statutory employment presumption. As the commentary notes, "[t]he Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist." *Ex Parte No. MC-43 (Sub-No. 16), Lease and Interchange of Vehicles (Identification Devices)*, 3 I.C.C.2d 92, 93 (1986).

As this Court noted in *Bays*, "[a]dministrative agencies, like the ICC, are entitled to deference when interpreting their own regulations." *Bays*, 691 F. Supp. 2d at 731 (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The plain language of the amendment coupled with the deference due agency interpretation of its own rules have led to the conclusion that Section 376.12 is neutral in its effect on the employer status of a covered carrier. *Id.* The Court concludes that *Bays* is well-reasoned and will therefore follow its holding.

As a result, the answer to whether Horizon can be held vicariously liable for injury caused by Bermel-Schanz's negligence lies in Kentucky agency law. *Id.* at 732. Ordinarily, a person commuting to or from work is considered to be acting outside the scope of employment. *Id.* (citing *Bisel v. United States*, No. 96-1500, 1997 WL 415316, at *2 (6th Cir. July 22, 1997)); *cf. Warrior Coal Co. v. Stroud*, 151 S.W.3d 29, 31 (Ky. 2004) (noting that under the "coming and going rule," injuries occurring on the way to or from work are not compensable). "[I]t is the nature of the trucking business that drivers will make deliveries and return home with no further load or assignment. These drivers are still, however, using the trucks in the business of the company." *Greenwell v. Boatwright*, 184 F.3d 490, 491-92 (6th Cir. 1999).

The relevant inquiry under Kentucky agency law asks whether Bermel-Schanz was "acting within the scope of his employment and in the furtherance of [Horizon's] business." *Bays*, 691 F.

Supp. 2d at 731 (quoting *Mid-States Plastics, Inc. v. Estate of Bryant ex rel. Bryant*, 245 S.W.3d 728, 730 (Ky. 2008)). "Within the scope of employment" means conduct "of the same general nature as that authorized or incidental to the conduct authorized." *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000). The Kentucky Supreme Court has clarified that the inquiry is a purposive question. "Thus, if the servant 'acts from purely personal motives . . . which [are] in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable." *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 52 (Ky. 2008) (alterations in original) (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Tort*s 506 (5th ed. 1984)).

The same questions of fact precluding summary judgment for Certain Underwriters and Scottsdale under Georgia contract law require resolution by a jury under Kentucky agency law. Again, there exist legitimate questions of fact concerning Bermel-Schanz's motives when he drove from his home in Georgia to the Flying J Truck Stop in Simpson County, Kentucky. And again, the Court cannot resolve these questions of fact. As a result, both parties' dispositive motions will be denied.

**B.** **Defendant's Motion to Exclude Expert Testimony (DN 121)**

Morrow has identified Whitney Morgan ("Morgan") as an expert witness in this matter. (Pl.'s Expert Disclosure, DN 84). Scottsdale has moved to exclude Morgan's testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Scottsdale's Mem. Supp. Mot. Exclude Whitney G. Morgan 4-10, DN 121-1 [hereinafter Scottsdale's Mot. Exclude]).

FRE 702 requires the trial court to perform a "gatekeeping role" when considering whether to admit expert testimony. *Daubert*, 509 U.S. at 597. To that end, the court has "the task of

ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* This gatekeeping function applies to nonscientific expert testimony as well. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-51 (1999). "[T]he test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."[4] *Id.* at 141 (internal quotation marks omitted). In cases unsuited to *Daubert*'s factors for the examination of scientific evidence, the trial court may rely on the witness's personal knowledge and experience in a relevant arena when performing its gatekeeping function. *Id.* at 150.

The Court notes from the outset that Morgan is not offering an opinion based on scientific expertise. Rather, he is testifying to what is customary in the trucking industry. Thus, the Court will focus on his personal knowledge and experience of the trucking industry when assessing his testimony. With respect to his qualifications, Morgan has offered advice and opinions in matters concerning compliance with the FMCSRs since approximately 1990. (Morgan Dep. 10:1-18, Feb. 16, 2016, DN 130). Morgan has assisted with audits concerning driver qualifications, inspections, drug and alcohol testing, repair and maintenance, and related subjects. (Morgan Dep. 16:7-17:5). According to Morgan, it is fairly common for him to specifically advise companies on whether a driver is furthering the business of a motor carrier. (Morgan Dep. 36:11-18). Morgan has testified in between a hundred and a hundred and fifty trials. (Morgan Dep. 35:22-36:5). The Court

---

[4] The Court in *Daubert* discussed four factors for a trial courts to consider when assessing the reliability of an expert opinion: (a) whether the theory or technique employed by the expert has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the method's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (d) the theory or method's general acceptance within the scientific community. *Daubert*, 509 U.S. at 593-94.

concludes Morgan is highly experienced in the trucking industry and is qualified to offer testimony in this case.

The next issue is whether Morgan's testimony would assist the trier of fact. Scottsdale correctly argues Morgan cannot testify on the insurance coverage issue. Morgan can, however, offer his opinion based on the evidence in the record and his experience on what is customary in the trucking industry and how the evidence relates as a matter of fact to the issue of whether Bermel-Schanz was furthering the business of Horizon at the time of the accident. *Amalu v. Stevens Transp., Inc.*, No. 15-cv-01116-STA-egb, 2018 WL 1911136, at *3 (W.D. Tenn. Apr. 23, 2018) (expert allowed to "testify as to his knowledge regarding customs and standard practices in the trucking industry and Defendants' conduct as a matter of fact regarding the terms 'motor carrier,' 'contract,' and 'employee.'").

Additionally, Scottsdale points out what it believes are inconsistencies in Morgan's deposition, contending that Morgan's testimony should be excluded as unreliable. (Scottsdale Mot. Exclude 3-4). But the Sixth Circuit has made it clear that it favors a broad interpretation of the Rule 702 standard. *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998). The Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence. *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004). Rather, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

The Court concludes that Morgan is qualified and his testimony is sufficiently relevant and reliable to allow Morrow to introduce it into evidence. Issues Scottsdale has raised regarding with

Morgan's opinions can be addressed through cross-examination. Scottsdale's motion is therefore denied.

C. **Motions to Exceed Page Limit (DN 139, 140, 147)/Plaintiff's Motion to File Supplemental Materials (DN 149)**

Certain Underwriters, Scottsdale, and Morrow have moved for leave to exceed the page limitations of LR 7.1(d), and Certain Underwriters has moved to file supplemental materials. Because those motions appear to be well taken and are unopposed, the motions will be granted.

IV. **CONCLUSION**

For the reasons stated above, **IT IS HEREBY ORDERED** as followed:

1. Defendant's Motion to Exclude Expert Testimony (DN 121), Defendants' Motions for Summary Judgment (DN 122, 123, 124), and Plaintiff's Motion for Summary Judgment (DN 125) are **DENIED**.

2, Plaintiff's Motion to Exceed Page Limit (DN 140), Defendants' Motions to Exceed Page Limit (DN 139, 147), and Plaintiff's Motion to File Supplemental Materials (DN 149) are **GRANTED**.

Greg N. Stivers, Chief Judge
United States District Court

August 5, 2019

cc: counsel of record